33. The Trustee has standing to bring these claims pursuant to section 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

    a.    the Defendants received "Customer Property" as defined in 15 U.S.C. §78*lll*(4);

    b.    BLMIS incurred losses as a result of the claims set forth herein;

    c.    BLMIS customers were injured as a result of the conduct detailed herein;

    d.    SIPC has not reimbursed, and statutorily cannot fully reimburse, all customers for all of their losses;

    e.    the Trustee will not be able to fully satisfy all claims;

    f.    the Trustee, as bailee of customer property, can sue on behalf of the customer-bailors;

    g.    the Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers, collectively, "Accountholders"). As of the date hereof, the Trustee has received multiple express unconditional assignments of the applicable Accountholders' causes of action, which actions could have been asserted against the Defendants. As assignee, the Trustee stands in the shoes of persons who have suffered injury-in-fact and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages. The Trustee brings this action on behalf of, among others, those defrauded customers of BLMIS who invested more money in BLMIS than they withdrew; and

    h.    SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding. SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds.

## THE FRAUDULENT PONZI SCHEME

34. Founded in 1959, BLMIS began operations as a sole proprietorship of Madoff and later, effective January 2001, formed as a New York limited liability company wholly owned by Madoff. Since in or about 1986, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, proprietor, chairman, and chief executive officer, ran BLMIS together with several family members and a number of additional employees. BLMIS was registered with the SEC as a securities broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(b). By that registration, BLMIS is a member of SIPC. BLMIS had three business units: investment advisory (the "IA Business"), market making and proprietary trading.

35. For certain accounts in the IA Business, BLMIS purported to participate in a capital appreciation/depreciation strategy, depending on whether the customer sought to generate gains or losses. For example, the strategy was executed by either purporting to purchase small groups of securities near lows and then purporting to sell those same securities at highs, or by purporting to short-sell securities near highs and then purporting to repurchase those securities near lows.

36. For other accounts, Madoff described the IA Business' strategy as a "split-strike conversion" strategy. Madoff promised these clients that their funds would be invested in a basket of common stocks within the S&P 100 Index, which is a collection of the 100 largest U.S. publicly traded companies. The basket of stocks would be intended to mimic the movement of the S&P 100 Index. Madoff asserted that he would carefully time purchases and sales to maximize value, but this meant that the clients' funds would intermittently be out of the market, at which times they would purportedly be invested in U.S. issued securities and money market funds. The second part of the split-strike conversion strategy was the hedge of such purchases

with option contracts. Madoff purported to purchase and sell S&P 100 Index option contracts that closely corresponded with the stocks in the basket, thereby controlling the downside risk of price changes in the basket of stocks.

37. Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in – or had been traded through – their accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a complete fabrication. The security purchases and sales depicted in the account statements virtually never occurred and the profits reported were entirely fictitious. At his Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts. *See* Plea Allocution of Bernard L. Madoff at 3, *United States v. Madoff,* No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50). Indeed, based on the Trustee's investigation to date and with the exception of isolated individual trades for certain clients, there is no record of BLMIS having cleared any purchase or sale of securities on behalf of the IA Business at the Depository Trust & Clearing Corporation, the clearing house for such transactions.

38. Prior to his arrest, Madoff assured clients and regulators that he conducted all trades on the over-the-counter market after hours. To bolster that lie, Madoff periodically wired tens of millions of dollars to BLMIS' affiliate, Madoff Securities International Ltd. ("MSIL"), a London based entity substantially owned by Madoff and his family. There are no records that MSIL ever used the wired funds to purchase securities for the accounts of the IA Business clients.

39. Additionally, based on the Trustee's investigation to date, there is no evidence that BLMIS ever purchased or sold any of the options that Madoff claimed on customer statements to have purchased and sold.

40. For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and Madoff and his co-conspirators concealed the ongoing fraud in an effort to hinder, delay, or defraud other current and prospective customers of BLMIS. The money received from investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to – or payments on behalf of – other investors. The money sent to BLMIS for investment, in short, was simply used to keep the scheme going and to enrich Madoff, his associates and others, including Fiterman and the Defendants, until such time as the requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

41. The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud. The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors and to lure other investors into the Ponzi scheme.

42. During the scheme, certain investors requested and received distributions of the so-called "profits" listed for their accounts which were nothing more than fictitious profits. Other investors, from time to time, redeemed or closed their accounts, or removed portions of purportedly available funds, and were paid consistently with the statements they had been receiving. Some of those investors later re-invested part or all of those withdrawn payments with BLMIS.

43. When payments were made to or on behalf of these investors, including the Initial Transferee Defendants, the falsified monthly statements of accounts reported that the accounts of such investors included substantial gains. In reality, BLMIS had not invested the investors' principal as reflected in customer statements. In an attempt to conceal the ongoing fraud and

thereby hinder, delay, or defraud other current and prospective investors, BLMIS paid to, or on behalf of, certain investors the inflated amounts reflected in the falsified financial statements, including principal and/or fictitious profits.

44. BLMIS used the funds deposited from new investments to continue operations and pay redemption proceeds to or on behalf of other investors and to make other transfers. Due to the siphoning and diversion of new investments to fund redemptions requested by other investors, BLMIS did not have the funds to pay investors on account of their new investments. BLMIS was able to stay afloat only by using the principal invested by some clients to pay other investors or their designees.

45. In an effort to hinder, delay, or defraud authorities from detecting the fraud, BLMIS did not register as an Investment Advisor until September 2006.

46. In or about January 2008, BLMIS filed with the SEC a Uniform Application for Investment Adviser Registration. The application represented, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion. In fact, in January 2008, BLMIS had approximately 4,900 active client accounts with a purported value of approximately $65 billion under management.

47. Not only did Madoff seek to evade regulators, Madoff also had false audit reports "prepared" by Friehling & Horowitz, a three-person accounting firm in Rockland County, New York. Of the two accountants at the firm, one was semi-retired and living in Florida for many years prior to the Filing Date.

48. At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS. At all relevant times, BLMIS was insolvent in that (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

## THE TRANSFERS

49.  According to BLMIS' records, Accounts Nos. 1F0021, 1F0200, 1T0015 were maintained with BLMIS, as set forth on Exhibit A (the "Accounts"). Upon information and belief, for each Account, a Customer Agreement, an Option Agreement, and/or a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Account Agreements") were executed and delivered to BLMIS at BLMIS' headquarters at 885 Third Avenue, New York, New York.

50.  The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Accounts were held in New York, New York, and Fiterman and/or one or more of the Defendants sent funds to BLMIS and/or to BLMIS' account at JPMorgan Chase & Co., Account #xxxxxxxxxxx1703 (the "BLMIS Bank Account") in New York, New York for application to the Accounts and the purported conducting of trading activities. Between the dates the Accounts were opened and the Filing Date, Fiterman and/or one or more of the Defendants made deposits to BLMIS through checks and/or wire transfers into the BLMIS Bank Account and/or received inter-account transfers from other BLMIS accounts.

51.  During the six years prior to the Filing Date, BLMIS made the transfers of fictitious profits to the Initial Transferee Defendants in the following amounts: $48,952,609 to the Fiterman Revocable Trust and Shirley Fiterman; $38,356,992 to the Fiterman Non-Exempt Marital Trust; and $340,000 to the Fiterman Non-Exempt Marital Trust and Towers Management, for a total amount of $87,649,601 (collectively, the "Transfers"). The Transfers constitute non-existent profits supposedly earned in the Accounts, but, in reality, they were other people's money. The Transfers were made to, or for the benefit of, the Defendants and are set forth in Columns 10 and 11 on Exhibit B annexed hereto.

52. The Transfers that are avoidable and recoverable under sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of N.Y. CPLR 203(g) (McKinney 2001) and DCL sections 273 – 279 (McKinney 2001) total at least $87,649,601 and are referred to hereafter as the "Six Year Transfers." See Exhibit B, Column 11.

53. The Transfers that are avoidable and recoverable under sections 548(a), 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3) total at least $38,356,992, and were made to the Fiterman Non-Exempt Marital Trust. These transfers are referred to hereafter as the "Two Year Transfers." See Exhibit B, Column 10.

54. Upon information and belief, some or all of the Transfers were subsequently transferred by the Initial Transferee Defendants to the Subsequent Transferee Defendants (collectively, the "Subsequent Transfers").

55. The Subsequent Transfers, or the value thereof, are recoverable from the Subsequent Transferee Defendants pursuant to §550(a) of the Bankruptcy Code.

56. In addition to the Transfers identified above, the Trustee's investigation has revealed that the Initial Transferee Defendants have received $174,165,289 of principal transfer over the history of the Accounts.

57. To the extent discovery reveals that the Defendants were aware, or should have been aware, of irregularities in their BLMIS accounts that would have provided them with inquiry notice of Madoff's fraud, the Trustee reserves the right to (i) supplement the information regarding the Transfers and Subsequent Transfers and any additional transfers, and (ii) seek recovery of some or all of the full history of principal transfers of $174,165,289 that were made by BLMIS to, or for the benefit of, the Defendants.

58. To the extent that any of the avoidance and/or recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

**CUSTOMER CLAIMS**

59. On or about February 23, 2009, the Fiterman Non-Exempt Marital Trust filed a customer claim with the Trustee which the Trustee has designated as Claim No. 002973 (the "Customer Claim").

60. On or about October 26, 2010, the Trustee issued a Notice of Trustee's Determination of Claim to the Fiterman Non-Exempt Marital Trust (the "Determination") with respect to the Customer Claim. A copy of the Determination is attached hereto as Exhibit C.

61. The Fiterman Non-Exempt Marital Trust did not file an objection to the Determination with the Court.

62. Defendant Shirley Fiterman holds a BLMIS account in the name "Shirley Fiterman," designated as BLMIS Account No. 1F0198. Shirley Fiterman is the recipient and/or beneficiary of avoidable transfers as detailed above. On or about February 23, 2009, Shirley Fiterman filed a customer claim with the Trustee which the Trustee has designated as Claim No. 003156.

63. MSM Investment Group LLC ("MSM Investment") holds a BLMIS account in the name "MSM Investment Group LLC," designated as BLMIS Account No. 1M0246. Upon information and belief, the members of MSM Investment include Subsequent Transferee Defendants Steven Fiterman, Stephanie Fiterman, Miles Q. Fiterman II, and Matthew Fiterman, who are the recipients and/or beneficiaries of avoidable transfers as detailed above. On or about February 23, 2009, MSM Investment filed a customer claim with the Trustee which the Trustee has designated as Claim No. 003162.

64. Fairway II LLC ("Fairway II") holds a BLMIS account in the name "Fairway Partnership II," designated as BLMIS Account No. 1F0190. Upon information and belief, the members of Fairway II include Subsequent Transferee Defendants Steven Fiterman, Valerie Herschman, Karen Wasserman, and Lynn Guez, who are the recipients and/or beneficiaries of avoidable transfers as detailed above. On or about February 23, 2009, Fairway II filed customer claim with the Trustee which the Trustee has designated as Claim No. 003077.

65. The BLMIS accounts held by Defendant Shirley Fiterman, in her own name, MSM Investment, and Fairway II (together, the "Related Accounts") all filed claims (the "Related Account Customer Claims") for which the Trustee has yet to issue a determination and/or make distributions.

66. Upon information and belief, Defendant Shirley Fiterman, and Subsequent Transferee Defendants Steven Fiterman, Valerie Herschman, Karen Wasserman, Lynn Guez, Stephanie Fiterman, Miles Q. Fiterman II, and Matthew Fiterman, either directly or indirectly as members of MSM Investment and Fairway II, are the absolute owners of one or more of the Related Accounts and/or have beneficial or equitable interests in one or more of the Related Accounts.

67. On December 23, 2008, this Court entered an Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief ("Claims Procedures Order"; Docket No. 12). The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating. The Trustee intends to resolve the Customer Claim, the Related Account Customer Claims, and any related objections to the Trustee's determination of such claims through a separate hearing as contemplated by the Claims Procedures Order.

# COUNT ONE
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551

68. To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

69. Each of the Two Year Transfers was made on or within two years before the Filing Date.

70. Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

71. Each of the Two Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS' then existing and/or future creditors.

72. Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Fiterman Non-Exempt Marital Trust pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

73. As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment (i) against the Fiterman Non-Exempt Marital Trust: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Fiterman Non-Exempt Marital Trust for the benefit of the estate of BLMIS; and (ii) against the Trustee Defendants directing the Trustee Defendants to surrender and transfer or to otherwise facilitate the surrender and transfer of such avoided Two Year Transfers from the Fiterman Non-Exempt Marital Trust to the Trustee for the benefit of the estate of BLMIS.